United States Court of Appeals,

Fifth Circuit.

No. 92-1515.

Mildred AUSTIN, Plaintiff-Appellant,

v.

Donna SHALALA, Secretary of Health and Human Services, Defendant-Appellee.

July 13, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I.

A.

Mildred Austin's husband died on October 6, 1968. On August 3, 1977, she married Sam Chancler, but kept the Austin name. When Austin turned sixty on June 6, 1980, she had separated from Chancler and moved to Tyler, Texas. At that time, she apparently intended to obtain a divorce from Chancler.

Austin applied for widow's benefits on September 5, 1980, at the Tyler social security office.[1] She told the claims officer that she had remarried but was separated and intended to seek a divorce. Austin testified that the claims officer filled out the application form and then had her sign it. Austin's form states that she was not married. Although she acknowledges that she signed the form, she maintains that she never read it and that the claims officer did not tell her she could lose her benefits if she remained married.[2] Five months later, Austin reconciled with Chancler and never divorced.

At age sixty-two, Austin applied for survivor's benefits at the Amarillo social security office. The claims officer advised her that survivor's benefits would be about the same as the widow's

---

[1] A widow is eligible for such benefits upon reaching the age of 60 if she had been married to a deceased wage earner for more than 10 years and had not remarried.

[2] If Austin had divorced Chancler after age 60 and then remarried him, she would have remained eligible for widow's benefits.

benefits and it would not be worth the trouble to make the change. When Austin reached age sixty-five, she applied for retirement benefits on her own account. At this point, the Social Security Administration ("SSA") discovered that she had been married and sent her a letter on July 21, 1987, that demanded repayment of $27,489. The SSA later reduced this demand to $25,124.80.

## B.

Austin requested a waiver of recovery, and the SSA denied that request on August 23, 1988. Austin then requested a hearing before an administrative law judge ("ALJ"). At the hearing on July 20, 1989, Austin was represented by counsel, presented her testimony, and asked for a waiver. The ALJ concluded that Austin had failed to provide material information to the SSA and had received payments that she knew or should have known to be incorrect. On October 2, 1989, the ALJ issued a decision holding that Austin was "not without fault" in creating the overpayment. The appeals council denied her request for review.

Austin filed a timely complaint in the district court on March 26, 1990. Both parties moved for summary judgment, and Austin moved for a jury trial. On March 27, 1992, the magistrate judge recommended that the Secretary's motion for summary judgment be granted and the request for jury trial be denied. Over Austin's objections, the district court adopted the magistrate judge's findings and entered judgment in favor of the Secretary.

## II.

Austin claims she was entitled to a waiver of repayment pursuant to 42 U.S.C. § 404(b), which provides in part that

> ... there shall be no adjustment of payments to, or recovery from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

The social security regulations define when a claimant must be found to be "without fault" as follows:

> ... Where an individual accepts such overpayment because of reliance on erroneous information from an official source within the [SSA] ... such individual, in accepting such overpayment, will be deemed to be "without fault."

20 C.F.R. § 404.510a (1992). In determining fault, the Secretary will consider other relevant factors such as the claimant's age, intelligence, education, and physical and mental condition." 20 C.F.R. §

404.507 (1992).

Our review of a final decision of the Secretary under 42 U.S.C. § 405(g) is limited to determining whether it is supported by substantial evidence and whether there were any errors of law made in the evaluation of the evidence. *Bray v. Bowen,* 854 F.2d 685, 686-87 (5th Cir.1988). Substantial evidence is evidence that a reasonable mind would accept as adequate to support the decision. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

Austin asserts that she relied upon erroneous information provided by the claims officer and that she relied solely upon the interviewer to complete her application. The first argument has no merit. Austin maintains that the erroneous statement regarding her marital status was provided by the claims officer because he filled out the form. Austin signed the form, which stated that she was unmarried when she was in fact married.

The ALJ reasonably could conclude from the record that Austin led the claims officer to believe that she would be unmarried in the near future. Even under these circumstances, we can find no authority for classifying Austin as unmarried; the claims officer apparently erred. We find no authority for the proposition that an error by a claims officer means that the claims officer has supplied erroneous information. Here, the claims officer did not supply Austin with any information at all; he merely filled out her claim form. Moreover, Austin asserts that she did not read the form, so she could not possibly have relied upon the error. The ALJ's decision is supported by substantial evidence.[3]

Regarding Austin's second contention, the ALJ found that Austin was "not without fault," because she was negligent in not catching the mistake on the form. Austin testified that she did not read the form, thus supporting this finding with substantial evidence. In her reply brief, Austin argues that negligence should not necessarily equate with a finding of "not without fault." This court has not previously addressed that issue.

---

[3]We likewise reject Austin's assertion that if the second claims officer had thoroughly reviewed her case on her 62nd birthday, the mistake would have been discovered at that time and five years of overpayment would have been prevented. Although this may be true, the law does not impose a duty on the Secretary to review thoroughly an applicant's prior record simply because the applicant has made an inquiry regarding a change in benefits.

We conclude that when a claimant fails to read a benefits form and verify that the information thereon is correct, the claimant who signs the form may be held to be "at fault" if the information turns out to be incorrect. *See Chapman v. Bowen,* 810 F.2d 151, 152-53 (8th Cir.1986) (per curiam). If the rule were otherwise, claimants could lie about the information and later claim they did not know that the form was incorrect. Under the circumstances of this case, we find nothing offensive about holding a claimant bound by the content of documents she has signed.[4]

III.

Austin also argues that she was entitled to a jury trial. The question of whether a social security recipient is entitled to a jury trial when the Secretary seeks to recoup an overpayment of benefits is *res nova.*

Austin characterizes the present action as a common law proceeding on a debt, brought by the Secretary against her for repayment of her past benefits. The Secretary responds that such an argument is "inconsistent with the limitations upon judicial review of Social Security proceedings set out in the Social Security Act." Section 405(g) constitutes the sole and exclusive method for obtaining judicial review of an administrative decision in a social security case. *See Mathews v. Eldridge,* 424 U.S. 319, 327, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976) (noting that an appeal under section 405(g) constitutes the sole method of judicial review for a denial of benefits). The express terms of the statute apply to *any* final decision of the Secretary, not just to a denial of benefits.

We find the Secretary's reasoning irrelevant to the issue before us. As we interpret the Secretary's argument, Austin is not entitled to a jury trial because the social security act does not provide for one. The right to trial by jury, however, is a right delineated in the Seventh Amendment. If the Seventh Amendment requires a jury trial in this instance, the statute would be unconstitutional as applied to this type of action. In other words, the provisions of the statute have no bearing on the question of whether a jury trial is constitutionally required.

The traditional rule regarding jury trials in suits involving the United States is that there is

---

[4]*But see United States v. Phillips,* 600 F.2d 535, 540 (5th Cir.1979) (limited education of claimant can affect responsibility).

no constitutional right to trial by jury in a suit *against* the United States. 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2314, at 68 (1971). "It is reasoned that the authorization given by Congress to the courts to entertain these actions is not a grant of jurisdiction under Article III of the Constitution but a method adopted by Congress under Article I to pay the debts of the United States. The Seventh Amendment is not applicable because it applies only to "suits at common law' and it is said that at common law there was no right of action against a sovereign enforceable by jury trial or otherwise." *Id.* (citing *United States v. Sherwood,* 312 U.S. 584, 587, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941); *McElrath v. United States,* 102 U.S. 426, 440, 26 L.Ed. 189 (1880); *Galloway v. United States,* 319 U.S. 372, 388, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458 (1943)). A jury trial in a suit against the United States is required only if a statute expressly or by fair implication provides for one.

On the other hand, where the United States brings the action, the right to trial by jury is determined in the same manner as if the suit were between private parties. 9 WRIGHT & MILLER, *supra,* § 2314, at 70; *see Tull v. United States,* 481 U.S. 412, 418-19, 107 S.Ct. 1831, 1836, 95 L.Ed.2d 365 (1987); *Damsky v. Zavatt,* 289 F.2d 46, 51 (2d Cir.1961); *Vandevander v. United States,* 172 F.2d 100, 101 (5th Cir.1949). In those instances, the usual rule applies that there is a right to jury trial only for claims and issues of a legal nature, and not for those of an equitable nature. 9 WRIGHT & MILLER, *supra,* § 2314, at 70-71. The posture of the parties and issues raised by the case are therefore important considerations in resolving this issue.

On the surface, this case appears to involve a suit against the government, because Austin sued the government in an attempt to obtain a waiver. Under the statutory scheme, once the Secretary determines that the recipient must pay back the overpayments, the claimant must invoke the administrative process to challenge that determination. Here, Congress has established an administrative procedure to recover overpaid benefits. In the absence of that scheme, the government would have to bring suit against the recipient to recover the overpayments. The administrative system merely shifts the burden of proceeding to the recipient.

The overall scheme established by Congress allows the government to recover money from

a recipient. For purposes of applying the Seventh Amendment, we will treat this suit as if the Secretary had brought the action. In actuality, the Secretary does initiate such proceedings by determining that a claimant must repay overpaid benefits. Were we to treat the present case as a suit by a citizen against the Secretary, Congress could eviscerate the right to a jury simply by setting up administrative schemes to shift the positions of the parties. Because this case is ostensibly a suit by the government to recover money, the Seventh Amendment applies. *See Tull,* 481 U.S. at 418-19, 107 S.Ct. at 1836.

Our decision to look behind the form of the lawsuit is supported by the authorities cited above. As we observed, the Seventh Amendment normally does not apply in situations in which the United States is a defendant, as such suits are considered to be a method of paying the debts of the United States. Here, the United States does not seek to pay a debt; it seeks to *recover* money purportedly paid to a social security claimant by mistake. Where the substance of the case involves an attempt by the government to recover money, Congress may not avoid the Seventh Amendment by setting up an administrative scheme to change the form of the action.

Where Congress sets up a statutory procedure, we must determine whether the constitution demands a jury trial by applying the relevant test established by the Supreme Court:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder.

*Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989). Below, we address each element of this test.

Austin characterizes this litigation as akin to an action on a debt, thus requiring a jury trial. *See Hepner v. United States,* 213 U.S. 103, 115, 29 S.Ct. 474, 479, 53 L.Ed. 720 (1909). We disagree with this characterization. Where the Secretary tries to recoup an overpayment of benefits, the Secretary is seeking restitution. *See* E. ALLAN FARNSWORTH, CONTRACTS 98 (1982) (example of suit in quasi-contract is one in which claim is "for the return of money paid by mistake to one to

whom it was not owed");  *Turner v. McMahon,* 830 F.2d 1003, 1009 (9th Cir.1987) (state seeking to recoup overpayment of AFDC benefits may bring suit for restitution).

A suit in quasi-contract falls under the common law writ of general assumpsit.  *See* RESTATEMENT OF RESTITUTION § 5(a) (1937) (appropriate proceeding in an action at law for payment of money in restitution is general assumpsit).  Specifically, this suit is an action for *indebitatus assumpsit.*  LORD ROBERT GOFF OF CHIEVEREY & GARETH JONES, THE LAW OF RESTITUTION (3d ed. 1986);  LON L. FULLER & MELVIN A. EISENBERG, CONTRACTS 295-96 (4th ed. 1981).[5]  In England in 1791, these actions were at law and were tried to a jury.  *Granfinanciera,* 492 U.S. at 48, 109 S.Ct. at 2793.

Today, many equitable claims have restitutionary measures of damages.  "Although [Lord] Mansfield's description of quasi contract as "equitable' has been repeated many times, this refers merely to the way in which a case should be approached, since it is clear that the action is at law and the relief given is a simple money judgment."  1 GEORGE E. PALMER, THE LAW OF RESTITUTION, § 1.2, at 9 (1978).[6]  In order to make assumpsit available in quasi-contractual settings where there was no actual contract or promise, the law would imply a promise on the part of the defendant to pay for benefit received.  *Id.* § 1.1, at 5.  With the advent of this legal fiction, quasi-contractual actions became common law actions for general assumpsit.  Because general assumpsit was a legal action at common law, a suit in quasi-contract requires a jury trial.  *See Beard v. Braunstein,* 914 F.2d 434, 438 (3d Cir.1990) (noting that an action for *indebitatus assumpsit* would have been tried to a jury

---

[5]An *indebitatus assumpsit* action may also be called an action for "money had and received." *See United States v. California,* --- U.S. ----, ----, 113 S.Ct. 1784, 1787, 123 L.Ed.2d 528 (1993);  *Gaines v. Miller,* 111 U.S. 395, 397-98, 4 S.Ct. 426, 427, 28 L.Ed. 466 (1884).

[6]Modern courts have confused Mansfield's description of the equitable nature of the cause of action with the question of whether the cause arises at law or in equity.  Because restitution is available as a measure of damages in a number of situations where the proceeding is in equity, *see First Nat'l Bank v. Warren,* 796 F.2d 999, 1000 (7th Cir.1986) (noting that although restitution began as a distinctive cause of action, modern courts have applied such principles as a measure in actions of all sorts), some courts have incorrectly stated that a restitution action is one in equity rather than at law.  *Crews v. Central States, S.E. & S.W. Areas Pension Fund,* 788 F.2d 332, 336 (6th Cir.1986) (confusing the remedy of restitution with a cause of action for restitution and denying the right to jury trial).  The present case presents a classic example of a restitution cause of action.

in 1791);  5 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 38.11[5], at 38-82 (2d ed. 1993) (general assumpsit was an action at law).

The first prong of the test, then, suggests that an action to recover overpaid social security benefits should be tried to a jury.  The second prong of the test buttresses this conclusion.  Because the Secretary seeks to recover money damages for the wrongly paid benefits, the remedy sought by the government is obviously of a legal nature as well.  *See Beard,* 914 F.2d at 438 (citing numerous authorities for the proposition that money damages are a legal remedy).  We conclude that the two relevant factors "indicate that a party is entitled to a jury trial under the Seventh Amendment."

We must now decide whether Congress may constitutionally assign the resolution of Austin's claim to a non-Article III adjudicative body that does not use a jury as a factfinder.  "... Congress' power to block application of the Seventh Amendment to a cause of action has limits.  Congress may only deny trial by jury in actions at law, we said, in cases where "public rights' are litigated:  "Our prior cases support administrative factfinding in only those situations involving "public rights," e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights.' "  *Granfinanciera,* 492 U.S. at 51, 109 S.Ct. at 2795 (citations omitted).

Although the definition is somewhat nebulous, at a minimum, suits involving public rights are those "which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."  *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932).  Beyond that, certain other cases are said to involve public rights where Congress has created a "seemingly "private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Granfinaciera,* 492 U.S. at 54, 109 S.Ct. at 2797 (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 593-94, 105 S.Ct. 3325, 3339-40, 87 L.Ed.2d 409 (1985) (Brennan, J., concurring)).

In *Crowell,* the Court stated that Congress may create administrative agencies to determine matters in connection with the following areas:  commerce, taxation, immigration, public lands, public health, the post office, and payments to veterans.  The assessment of tax penalties may be made

without a jury.  *Helvering v. Mitchell,* 303 U.S. 391, 402, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938).

Similarly, the Court has approved the use of administrative agencies in adjudicating violations of the customs and immigration laws and assessing penalties therefor.  *Lloyd Sabaudo Societa v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 170, 77 L.Ed. 341 (1932).  "Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field.  This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency."  *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 455, 97 S.Ct. 1261, 1269, 51 L.Ed.2d 464 (1977).

Here, Congress has created a public right for the government to recover the overpayment of social security benefits, and the SSA has special competence in this field.  On the basis of the above authority, we conclude that Congress may properly assign the relevant determinations to an administrative agency, and a jury trial is not required.[7]  If Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws, *see Oceanic Nav. Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909), it plainly may employ such a body to recover overpayments of government largess.  As the Supreme Court has acknowledged, Congress may employ an administrative agency even if a jury would be required if Congress has chosen to enforce the law with judicial proceedings.  *Atlas Roofing Co.,* 430 U.S. at 460, 97 S.Ct. at 1271-72.

The judgment of the district court is AFFIRMED.

---

[7]Of course, even if Austin were entitled to a jury trial, the issue of whether she was entitled to a waiver would be tried to the court.  By providing for waiver, Congress has conferred an equitable defense to an otherwise valid legal claim.  If a jury trial were required, only the issue of whether Austin had been overpaid would be decided by the jury.

Here, Austin does not dispute that she was overpaid.  Under these circumstances, she would not be entitled to a jury trial, as no legal issue exists for trial;  the only remaining issue is an equitable one.